THE STATE OF DELAWARE v. CRANE HOOK OIL STORAGE COMPANY.

(*February* 13, 1941.)

LAYTON, C. J., RICHARDS and TERRY, J. J., sitting.

*W. Reese Hitchens,* Deputy Attorney-General, for the State.

*William H. Bennethum* (of Marvel and Morford) for the defendant.

Superior Court for New Castle County, January Term, 1941.

LAYTON, Chief Justice:

The State of Delaware has sued to recover from the defendant motor fuel taxes in the sum of $4,639.95. The demand consists of two items: 1. the tax at three cents a gallon on 148,043 gallons of gasoline during the period from July 1, 1930 to June 30, 1933, amounting to the sum of $4,441.29; 2. the tax at the same rate on 6,622 gallons from September 1 to September 30, 1933, amounting to $198.66.

During the first period the statute in force was Chapter 14, Volume 33, Laws of Delaware, as amended by Chapter 10, Volume 35, Delaware Laws. During the second period the statute in operation was Chapter 31, Volume 38, Laws of Delaware. By the first Act the term, "Dealer" was defined to be "any person * * * who imports or causes to be imported gasoline * * * for operating or propelling motor vehicles, as herein defined, for use, distribution or sale and delivery in and after the same reaches the State of Delaware * * *". Each dealer was required to render monthly statements of all motor vehicle fuel sold or used by him in the State, and by the amendment a license tax of three cents a gallon was imposed. By the second Act, the term, "Distributor," was defined as including "any person * * * wherever resident or located, who imports or causes to be imported into the State motor fuels as herein defined, for use, distribution, storage, or sale after the same reach the State", and a like tax was levied on all motor fuel, sold and delivered or used in the State which was not under the protection of the interstate commerce clause of the Federal

Constitution. By both statutes the taxes collected were allocated to the State Highway Fund, and to each Act was a long preamble declaring, inter alia, the purpose of the Legislature more equitably to distribute among those actually benefiting the burden of constructing and maintaining the public highways of the State, and asserting the police power of the State to enact legislation to aid the successful operation of motor vehicles on its highways.

From the stipulation of facts filed it appears that the defendant is a Delaware corporation, with its principal office and place of business in Wilmington, Delaware. For several years prior to the dispute, its business consisted solely in purchasing outside the State and having shipped to Wilmington by tank steamers, gasoline, kerosene and fuel oil. From the defendant's deep water oil terminal in Wilmington the oils were pumped through pipe lines to the defendant's storage tanks in that City. The defendant sold all of the oil, except the gasoline used for the propulsion of its tank trucks, to Schock Independent Oil Company, a Delaware corporation, having its main office and place of business in Mount Joy, Pennsylvania. From this office it received its orders and shipping instructions; and it made deliveries of the oils, in part, by auto tank trucks over public highways to the Schock Company at the destinations named by it. All of the deliveries were at points outside the State except a relatively small part which were made to the Schock Company at the defendant's storage tanks in Wilmington for sale by that company in Delaware. The title to all of the oils remained in the defendant until delivery to the Schock Company at the delivery and destination points, when the title passed to the customer; and the defendant bore all costs of delivery.

The gasoline involved in the action was that consumed

in the defendant's auto tank trucks in making deliveries as directed by the Schock Company from Wilmington to points outside the State; and it was stipulated, if deemed material, that fifteen percentum only of all interstate movements of the defendant's trucks was over the highways of Delaware.

The parties agree that the sole question presented is whether the tax on the gasoline withdrawn from its storage tanks in Wilmington and consumed in transporting by its trucks the oils to destinations in other states is imposed in violation of the interstate commerce clause of the Constitution of the United States. Art. 1, § 8, Cl. 3.

Lexicographers and courts agree that the word "use" is one of the most comprehensive words in our language. 66 C. J. 65. As a noun, the primary definitions are, inter alia, the application of anything to an end, the act of employing anything, or of applying it to one's service. The exercise of any right of ownership over property is a use of it. Possibly the word may have the meaning of "consume", but such is not its usual significance. See In re *Moor's Estate*, 163 *Mich.* 353, 128 *N. W.* 198. As we view the sense of the word in its relation to the language of statutes, we think it was not meant that the incidence of the tax should be restricted to gasoline actually consumed in the operation of motor vehicles on the public highways of the State. This is implied in the first Act, for there is no provision for rebate of the tax on gasoline placed in this State in the fuel tank of the motor vehicle, but actually consumed in another State; and in the second Act it is expressly declared that a dealer shall not be exempt from the tax imposed on motor fuel used in making distributions. The exercise by the dealer or distributor of his right of ownership over the gasoline in withdrawing it from the storage tank and putting it in the fuel tank

of a motor vehicle for the purpose of propulsion is a use or event which evokes the operation of the tax. There may be expressions in the preambles of the Acts which may be seized upon to indicate that the tax was levied only as a toll or charge for the use of the highways in this State but it is sufficiently clear from the bodies of the Acts that the levy was intended as a license tax on the use of the property within the broad primary meaning of the word use. Where the enacting part of the statute is unambiguous, its meaning will not be controlled or affected by anything in the preamble. *Lewis's Sutherland Stat. Cons.*, 2d Ed., 653; 59 C. J. 1004; Black, Interp. L., 2d Ed., § 84; *United States v. Webster*, 28 *Fed. Cas.* page 509, No. 16,658.

The regulation of interstate and foreign commerce is within the exclusive control of Congress, and the rule is settled that a state law which burdens such commerce or its free flow is outside of the regulating power of the state; but in determining the question there is a necessary and well defined distinction between direct and indirect effects. If the commerce clause were construed to reach all transactions which could be said to have an indirect effect upon interstate commerce, the Federal authority would embrace practically all of the activities of the people, and the authority of the State over its domestic concerns would exist only by sufferance of the Federal Government. *A. L. A. Schechter Poultry Corp. v. United States*, 295 *U. S.* 495, 55 *S. Ct.* 837, 79 *L. Ed.* 1570, 97 *A. L. R.* 947. Every tax on personal property, occupations, business or franchises, affects to some extent the subjects and operations of commerce. The transit of persons and property from one state to another may always be said to be impeded in some degree for the reason that the expense of transit is necessarily increased by the tax; but the in-

creased cost to the interstate operator is not, of itself, significant. The prohibited burden on interstate commerce is interference with that commerce, a matter quite distinct from the expense of doing business. *Delaware Railroad Tax*, 18 *Wall.* 206, 21 *L. Ed.* 888; *Southern Pacific Co. v. Gallagher*, 306 *U. S.* 167, 59 *S. Ct.* 389, 83 *L. Ed.* 586.

The regulatory power of Congress does not attach until the transit begins, and conversely, the power ceases when the movement reaches the point where the parties originally intended that it should finally end. The crucial question to be settled in determining whether personal property moving in interstate commerce is subject to local taxation is that of its continuity of transit, *Carson Petroleum Co. v. Vial*, 279 *U. S.* 95, 49 *S. Ct.* 292, 73 *L. Ed.* 626; and if property is detained for an indefinite time during transit, at least for other than natural causes or lack of facilities for immediate transportation, it is not during that time the subject of interstate commerce but is subject to the operation of state laws. *Susquehanna Coal Co. v. South Amboy*, 228 *U. S.* 665, 33 *S. Ct.* 712, 57 *L. Ed.* 1015. Even practical continuity does not always make an act a part of interstate commerce. *Southern Pacific Co. v. Gallagher, supra.*

It appears from the stipulation of facts that almost all of the gasoline purchased outside the State and placed in the defendant's storage tanks in Wilmington was destined ultimately for points in other states; but at the time of the shipments from points of origin no definite destinations had been arranged for other than the defendant's storage tanks in Wilmington. The final destinations in other states were undetermined, and the Schock Company was at full liberty, and the defendant, under its arrangement with that company, was bound to deliver all of

the gasoline as it might be directed. The defendant was doing business in this State, and the property was under the shelter of its laws. The oil had reached the destination of its first shipment. It was held here, not for natural causes, or for want of facilities for immediate further movement, but for the business purposes outside of the mere transportation of the oil. When placed in the defendant's storage tanks, the gasoline ceased to be a subject of interstate commerce and lost its immunity as such. It became a part of the common store of goods within the State, protected by its laws, and subject to local taxation. *General Oil Co. v. Crain*, 209 *U. S.* 211, 28 *S. Ct.* 475, 52 *L. Ed.* 754; *Nashville, C. & St. L. Ry. Co. v. Wallace*, 288 *U. S.* 249, 53 *S. Ct.* 345, 77 *L. Ed.* 730, 87 *A. L. R.* 1191.

In *Edelman v. Boeing Air Transport, Inc.*, 289 *U. S.* 249, 53 *S. Ct.* 591, 592, 77 *L. Ed.* 1155, the State of Wyoming had imposed a license tax on all gasoline used or sold in the State for domestic consumption, and required wholesalers engaged in the sale or use of gasoline to make a report each month to the State Treasurer. A wholesaler was defined as any person who "imports or causes to be imported gasoline * * * for sale in the State * * * to the jobber or consumer, or to the persons * * * who, in turn, sell to the jobber or consumer" or "who produces, refines * * * or compounds gasoline" in the State "for use, sale or distribution in this State". *Laws Wyo.* 1923, *c.* 73.

The respondent maintained an interstate airplane service. It purchased gasoline both within and without the State, which it stored in its tanks at its airports. It contended that the tax could not be validly applied to the gasoline imported from without the State, stored in its tanks at the airports and used for "filling" the interstate airplanes in which it was eventually consumed. It was held that

the stored gasoline was deemed to be used within the state and therefore subject to the tax when it was withdrawn from the tanks, the Court saying, "A state may validly tax the 'use' to which gasoline is put in withdrawing it from storage within the state, and placing it in the tanks of the planes, notwithstanding that its ultimate function is to generate motive power for carrying on interstate commerce".

In *Nashville, C. & St. L. Ry. Co. v. Wallace, supra,* the State of Tennessee imposed a privilege tax on persons, dealers or distributors storing gasoline and distributing it, or allowing the same to be withdrawn from storage, whether such withdrawal was for sale or other use. The appellant, an interstate rail carrier, in the prosecution of its business, purchased large quantities of gasoline outside the State of Tennessee, brought it into the state in tank cars, and stored it in its own storage tanks. All of it was later withdrawn and used by it as a source of motive power in interstate railway operation in Tennessee, Kentucky, Alabama and Georgia. The tax was assailed both on the ground that it was imposed on the gasoline while still a subject of interstate commerce in the course of transportation from points of origin to points outside the State of Tennessee, and on the ground that the tax was in effect a tax on the use of the gasoline in the appellant's business as an interstate carrier, and, therefore, an unconstitutional burden on interstate commerce.

But, it was held that the gasoline, upon being unloaded and stored, ceased to be a subject of transportation in interstate commerce, and lost its immunity as such from state taxation; and the fact that the gasoline was, in the ordinary course of the appellant's business, later withdrawn from storage for use, some within and some without the state part of it thus becoming again the subject of interstate

transportation, did not affect the power of the state to tax it all before that transportation commenced. It was pointed out that neither the appellant, the shippers, nor the carrier, at the time of the shipment of the gasoline from points of origin, arranged a destination for any part of the oil other than the appellant's storage tanks in Tennessee; that while in the usual course of business a variable and undefined part of it, when segregated for that purpose, would again be transported across state boundaries, the appellant was free to distribute the oil either within or without the State for use in its business or for any other purpose; and that the oil in storage was not a subject of interstate commerce, and so was a part of the common mass of goods within the state subject to local taxation. "We cannot say", said the Court [288 U. S. 249, 53 S. Ct. 349, 77 L. Ed. 730, 87 A. L. R. 1191], "that the tax is a forbidden burden on interstate commerce because appellant uses the gasoline, subsequent to the incidence of the tax, as an instrument of interstate commerce". And to the objection that the tax violated the Fourteenh Amendment to the Federal Constitution, in that it levied a charge for the use of the highways which the appellant did not use, the Court made answer that the levy was a tax, not a toll or charge for the use of the highways, and that the constitutional power to levy taxes did not depend upon the enjoyment by the taxpayers of any special benefit from the use of the funds raised by taxation.

In *Southern Pacific Co. v. Gallagher, supra,* the California Use Tax Act of 1935 was attacked as violative of the commerce clause when imposed on tangible personal property brought outside of the State by the appellant, an interstate railroad, and installed on importation, or kept available for use, as a part of its transportation facilities.

The act imposed an excise on the consumer for the storage, use or other consumption of property when purchased from a retailer. Use was defined as the exercise of any right or power incident to ownership; storage as any keeping or retention. The appellant purchased outside the State of California rails, equipment, machinery, tools and office supplies. Some were used in the general offices of the company in the State; some for material kept in readiness as a replacement supply; and some for improvements or extensions pursuant to previously determined plans and specifications. All of the purchases might be said to be dedicated to consumption in the appellant's interstate transportation business. It was held that use and storage were taxable intrastate events, separate and apart from interstate commerce; and that state taxation of events preliminary to interstate commerce is permitted. Attention was called to some of the articles suitable only for utilization in the transportation facilities and installed immediately on arrival at the California destination; and with respect to these articles the Court said [306 U. S. 167, 59 S. Ct. 393, 83 L. Ed. 586], "If articles so handled are deemed to have reached the end of their interstate transit upon 'use or storage,' no further inquiry is necessary as to the rest of the articles which are subjected to a retention, by comparison, farther removed from interstate commerce. We think there was a taxable movement when the former had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. At that moment, the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective. The interstate movement was complete. The interstate consumption had not begun. * * * A tax on property or upon a taxable event in the state * * * does not interfere. This is a practicable adjustment of the right of the state to

revenue from the instrumentalities of commerce and the obligation of the state to leave the regulation of interstate and foreign commerce to the Congress".

*Helson et al. v. Kentucky,* 279 *U. S.* 245, 49 *S. Ct.* 279, 73 *L. Ed.* 683, and *McCarroll v. Dixie Greyhound Lines,* 309 *U. S.* 176, 60 *S. Ct.* 504, 84 *L. Ed.* 683, relied on by the defendant are not analogous cases. In the first case, the plaintiffs in error were engaged in operating a ferry boat on the Ohio River between the States of Kentucky and Illinois. The State of Kentucky attempted to collect a state tax on the use of gasoline within the territorial limits of Kentucky, although the gasoline was purchased and delivered to the plaintiffs in error in the State of Illinois in which state was the situs of all of their personal property and the location of its office and place of business. The second case involved a statute of Arkansas, Acts Ark. 1933, Act 67, which prohibited entry into the State of any motor vehicle carrying over twenty gallons of gasoline in its main or auxiilary tank to be used as motor fuel in the vehicle until the state tax of six and one-half cents a gallon had been paid. The appellee operated passenger busses propelled by gasoline from Memphis, Tennessee, across Arkansas to St. Louis, Missouri, and in reverse. Three miles of the route were in Tennessee, seventy-eight in Arkansas, and two hundred and sixty one in Missouri. Less than one gallon of gasoline was required for that part of the route in Tennessee, about sixteen gallons in Arkansas, and fifty-one gallons in Missouri. It was the appellee's practice to put in the bus tank in Memphis the sixty-eight gallons of gasoline commonly required for the trip and ten gallons more for emergencies. Upon arrival at the Arkansas line the tank contained about seventy-seven gallons of gasoline, of which sixteen gallons probably would be consumed in that state. Under the Act the appellee was required to pay the

tax on all of the gasoline above twenty gallons as a condition precedent to entry in the state. *Interstate Transit v. Lindsey,* 283 *U. S.* 183, 51 *S. Ct.* 380, 75 *L. Ed.* 953, is not in point.

A statute must be so construed, if fairly possible, as to avoid the conclusion that it is unconstitutional. *Collison v. State,* 9 *W. W. Harr.* (39 *Del.*) 460, 2 *A. 2d* 97, 119 *A. L. R.* 1422.

Judgment for the plaintiff will be entered in the sum of $4,639.95 without interest as was stipulated.